# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 2656 | **DATE** | 7/18/2000 |
| **CASE TITLE** | | Thomas & Betts Corp. et al. vs. Panduit Corp. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and order. The Court holds that Section 43(a)(3) of the Lanham Act 15 U.S.C. Section 1125(a)(3), enacted as PL 106-43 Section 5 of the Trademark Amendments Act of 1999 relating to the burden of proof of the functionality of non-registered trade marks and trade dress applies to pending cases. Plaintiffs Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. bear the burden of proving non-functionality of their unregistered trade dress as part of the claim of trade dress infringement against Defendant Panduit Corp.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 19 2000 | | 539 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | 7/17/2000 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| DK | courtroom deputy's initials | | DK mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS & BETTS CORP. and THOMAS & BETTS HOLDINGS, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 94 C 2656 |
| | ) | |
| v. | ) | |
| | ) | |
| PANDUIT CORP., | ) | Magistrate Judge Morton Denlow |
| | ) | |
| Defendant. | ) | |

DOCKETED
JUL 19 2000

## MEMORANDUM OPINION AND ORDER

In 1999, Congress enacted the Trademark Amendments Act of 1999 (the "Amendment" or "TAA"), which amended the Lanham Act by requiring parties claiming infringement of unregistered trade dress to bear the burden of proving non-functionality as part of their *prima facie* case. 15 U.S.C.§1125(a)(3). Plaintiffs Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. (collectively "T&B"or "Plaintiffs") argue that the Amendment must not be applied to cases pending when the Amendment was enacted. Defendant Panduit Corp. ("Panduit" or "Defendant") asserts that the Amendment properly governs pending cases. Now before the Court is the issue of whether the Lanham Act, as amended by the Amendment, requires Plaintiffs to bear the burden of proving non-functionality as part of their claim of unregistered trade dress infringement. This Court holds that it does.

539

# I. BACKGROUND FACTS

T&B and Panduit are the nation's largest suppliers of cable ties. Cable ties are nylon plastic straps used to tie together a group of cable or wire. For purposes of this motion, the following uncontested facts are adopted from the Seventh Circuit opinion. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277(7th Cir. 1998), *cert. denied* 525 U.S. 929, 119 S.Ct. 336 (1998). In 1965, T&B obtained a patent on the two-piece cable tie (the "Schwester patent"). That patent disclosed a two-piece cable tie with an oval head, metal barb and transverse slot. The oval shape of the head is not specifically claimed but is illustrated and described in the specifications. T&B currently markets a two-piece cable tie under the trademark TY-RAP that is essentially identical to the model disclosed in the Schwester patent. Though the Schwester patent expired in 1982 and a related patent also held by T&B expired in 1986, until 1993 T&B remained the sole producer of two piece cable ties with annual sales of almost $100 million worldwide.

In 1993, Panduit entered the two-piece cable tie market with the BARB-TY, an oval-headed, metal-barbed cable tie similar to T&B's TY-RAP. T&B promptly sued Panduit for multiple claims, two of which are currently pending: (1) trade dress infringement pursuant to 15 U.S.C. §1125(a); and (2) unfair competition under 15 U.S.C.§1125(a).

This case is currently set for trial on October 16, 2000. This opinion will guide the parties on the order and burden of proof on the issue of non-functionality.

## II. LEGAL BACKGROUND

### A. Tension Between Two Different Cannons of Statutory Construction

The legal issue that is presented to the Court is whether a statutory amendment establishing the burden of proof should be applied to a pending case when the amendment was enacted after the case was filed. To resolve this issue, the Court must reconcile two competing principles of law. The first principle is the rule that "a court is to apply the law in effect at the time it renders its decision." *Landgraf v. USI Film Products*, 511 U.S. 244, 264, 114 S.Ct. 1483, 1496 (1994)(quoting *Bradley v. School Bd. of Richmond*, 416 U.S.696, 711, 94 S.Ct. 2006, 2016 (1974)). The competing, and seemingly contradictory, axiom is that "[r]etroactivity is not favored in the law" and its corollary that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Landgraf*, 511 U.S. at 264, 114 S.Ct. at 1496 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471 (1988)). This tension between the two principles is the crux of the issue at hand.

### 1. A Court Is To Apply The Law In Effect When It Renders Its Decision

For nearly 200 years, jurisprudence in this country has adhered to the principle that courts must apply the law in effect when it renders its decision. This canon was first set forth in *United States v. Schooner Peggy*, 5 U.S.(1 Cranch) 103, 2 L.Ed. 49 (1801) by Chief Justice Marshall, who stated:

It is in the general true that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs the law must be obeyed, or its obligation denied. If the law be constitutional, and of that no doubt in the present case has been expressed, I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgement, rightful when rendered, but which cannot be affirmed but in violation of the law, the judgment must be set aside.

*Schooner Peggy*, 5 U.S.(1 Cranch) at 110.

This principle was applied in *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 89 S.Ct. 518 (1969), in which the Supreme Court held that a court must apply a Federal Department of Housing and Urban Development administrative circular regarding eviction proceedings to pending cases in which the eviction proceedings had been initiated. Although the circular did not indicate that it was to apply to pending cases, the Court applied it to the case pending, relying on *Schooner Peggy*. "*Thorpe* . . . stands for the proposition that even where the interv[en]ing law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 714, 94 S.Ct. at 2017.

The Court reaffirmed its position in *Bradley v. School Bd. of Richmond*, stating, "We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. . . . Accordingly, we must reject the

contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature" *Id.*, 416 U.S. at 711 & 715, 94 S.Ct. at 2016 & 2018.

In *Bradley*, the Court held that a statute granting a federal court the ability to award attorney's fees to a prevailing party who brings suit against a school board to enforce mandatory school desegregation must be applied to pending cases. *Id.*, 41 U.S. at 724, 94 S.Ct. at 2022. The Court stated that determining whether applying the law in effect at the time would result in manifest injustice requires a court to consider three things, "a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Id.*, 416 U.S. at 716, 94 S.Ct. at 2019. First, noting the expressions of congressional intent and concern surrounding the passage of the Civil Rights Act of 1964, the Court found that school desegregation was of "great national concern," a factor weighing in favor of application to pending cases. *Id.*, 416 U.S. at 719, 94 S.Ct. at 2020. Second, the Court stated that it is inappropriate for a court "to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Id.* The Court then found that no matured or unconditional right was affected by the change in statute, a factor also weighing in favor of application to a pending case. Regarding the third factor, injustice "stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Id.* The Court stated that, because the Board had a constitutional responsibility to follow the Civil Rights Act of

1964 and provide students with a nondiscriminatory education, no increased burden had been imposed by the amendment. In addition, the Court stated that the amendment provided no change in the substantive obligation of the parties. Finally, the Court found that the statutory award of attorney's fees did not impose additional unforeseeable obligation, because an award of attorney's fees was already an available under the common law, and because there was no indication that the Board would have changed its conduct, had the obligations of the new amendment been known. "[T]he Board engaged in a conscious course of conduct with the knowledge that, under different theories . . . the Board could have been required to pay attorney's fees. Even assuming a degree of uncertainty in the law at that time regarding the Board's constitutional obligations, there is no indication that the obligation under [the amendment] if known, rather than simply the common-law availability of an award, would have caused the Board to order its conduct so as to render this litigation unnecessary and thereby preclude the incurring of such costs. *Id.*, 416 U.S. at 721, 94 S.Ct. at 2021.

## 2. There Is A Presumption Against Retroactive Legislation

For an equally long period of time spanning over two centuries, there has existed an equal but opposite cannon of law which upholds the presumption against retroactive legislation, based on the principle that citizens should know the legal consequences of their conduct. *Id.*, 511 U.S. at 265, 114 S.Ct. at 1497. Although dating back to English common law, one of the first times this principle was recorded in the decisions of this country was in *Calder v. Bull*, 3 U.S. (1 Dall.)386, 391, 1 L.Ed. 648 (1798), in which Justice Chase stated, "Every law that takes away, or impairs, rights vested, agreeably to existing laws, is

retrospective, and is generally unjust; and may be oppressive; and it is a good general rule that a law should have no retrospect: but there are cases in which laws may justly, and for the benefit of the community, and also of individuals, relate to a time antecedent to their commencement."

This axiom was relied upon in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S.204, 109 S.Ct. 468 (1988) in which the Supreme Court refused to apply a Medicare Act provision retroactively. "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. . . . Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Id.*, 488 U.S. at 208-9, 109 S.Ct. at 471-2. This principle was also set forth in *Kaiser Aluminum & Chemical Corp., v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct. 1570, (1990). However, the Court declined to reconcile the two conflicting principles in *Kaiser*.

### 3. *Landgraf* Reconciliation Of The Conflicting Principles

In *Landgraf*, the Court confronted the "apparent tension" between the two principles head on. *Landgraf*, 511 U.S. 244, 114 S.Ct. 1483. The Court reconciled the line of cases that supported application of existing law to pending cases with the line of cases standing for the proposition that there is a presumption against retroactivity in the law. The issue before the *Landgraf* Court was whether the Civil Rights Act of 1991, providing for punitive and compensatory damages for intentional discrimination violations of Title VII and a right to a jury trial if those damages were claimed, applied to pending cases.

This Court rejects T & B's argument that *Landgraf* overrules *Bradley* and *Thorpe*. Nor does *Landgraf* do away with the general rule that a court must apply the law in effect at the time of trial. Quite the contrary. The Supreme Court in *Landgraf* went to great lengths to affirm both lines of cases and to distinguish the situations to which the opposing canons of law apply.

In affirming *Bradley* and the principle that a court must apply the law in effect at the time of trial, the Court held that the *Bradley* and *Thorpe* line of cases were "compatible with the line of decisions disfavoring 'retroactive' application of statutes." *Landgraf*, 511 U.S. at 276, 114 S.Ct. at 1503. "Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.*, 511 U.S. at 273, 114 S.Ct. at 1501. The Court then named several examples of intervening statutes that were applied to pending cases although the events that gave rise to the lawsuit occurred prior to the passage of the statute: statutes affecting the propriety of prospective relief, statutes conferring or ousting jurisdiction, remedial statutes, and changes in procedural rules even if the change worked to the defendant's disadvantage. *Id.*, 511 U.S. at 273-275, 114 S.Ct. at 1501-1502. The Court reasoned that procedural rules govern secondary, not primary, conduct, inferring that, even if a party had known the procedural change in advance, they would not have changed their conduct that gave rise to the lawsuit. The Court noted, however, that simply because a rule is procedural does not automatically mean that it must be applied to a pending case. *Id.*, 511 U.S. at 275 n.28, 114 S.Ct. at 1502.

The Court further explained that, had the new provision to a right to a jury trial not been inextricably woven into the new provisions allowing for punitive and compensatory damages, it would have applied the jury trial provision to trials conducted after the effective date of the statute, as "the jury trial right set out in §102(c)(1) is plainly a procedural change of the sort that would ordinarily govern in trials conducted after its effective date." *Id.*, 511 U.S. at 280, 114 S.Ct. at 1505. Notably, the Court stated, "If §102 did no more than introduce a right to jury trial in Title VII cases, the provision would presumable apply to cases tried after November 21, 1991, regardless of when the underlying conduct occurred." *Id.*, 511 U.S. at 280-1, 114 S.Ct. at 1505.

In holding that the two lines of cases are distinguishable from each other, the Supreme Court explicitly stated:

> [W]e now make it clear that *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely retroactive effect. Like the new hearing required in *Thorpe*, the attorney's fee provision at issue in *Bradley* did not resemble the cases in which we have invoked the presumption against statutory retroactivity. . . .
>
> . . . *Bradley* did not take issue with the long line of decisions applying the presumption against retroactivity. Our opinion distinguished, but did not criticize prior cases that had applied the antiretroactivity canon. . . .
>
> . . . [I]n none of our decisions that have relied upon *Bradley* or *Thorpe* have we cast doubt on the traditional presumption against truly retrospective application of a statute.

*Id.*, 511 U.S. at 277-9, 114 S.Ct. at 1503-4.

The real issue is not whether the intervening statute is procedural or substantive, but rather whether it has a retroactive effect. In defining what constitutes a "retroactive effect,"

9

the Court stated, "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectation based in prior law. Rather the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.*, 511 U.S. at 269-70, 114 S.Ct. at 1499. To this point, the Court explained:

> Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards. . . . 'If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.'

*Id.*, 511 U.S. at 270 n.24, 114 S.Ct. 1499 (quoting L. FULLER, THE MORALITY OF LAW 60 (1964)).

On the other hand, affirming the line of cases supporting the presumption against retroactivity, the Court articulated:

> Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal. In a free dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.

*Id.*, 511 U.S. at 265, 114 S.Ct. at 1497. The Court pointed out that the largest category of cases to which it has applied this presumption involves statutes affecting contractual or property rights, in which predictability and stability are very important.

The Supreme Court set forth the analytical framework for resolving issues of retroactive application of statutes, which has come to be known as the *Landgraf* test:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e. whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that if does not govern absent clear congressional intent favoring such a result.

*Id.*, 511 U.S. at 280, 114. S.Ct. 1505.

Thus, if Congress has explicitly mandated a retroactive application, courts must follow the intent of Congress as expressed in the statute and legislative history. Where the language of a statute does not clearly mandate a retroactive application, a court must determine whether applying the terms as indicated would have a genuinely retroactive effect. If so, the judicial presumption against retroactivity would bar its application. *Lindh v. Murphy*, 521 U.S. 320, 323, 117 S.Ct. 2059, 2062 (1997). If not, the court must apply the existing law to the case pending before it. *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016.

In *Landgraf*, the Court ultimately found that a provision of the Civil Rights Act of 1991 creating a right to recover compensatory and punitive damages and a right to a trial by jury if such damages are claimed, where no such relief was possible under prior law, did not apply to pending cases. In holding that the statute would have a retroactive effect if it were to be applied to the pending case, the Court reasoned that the new punitive damages

provision shared the punishment characteristic of criminal sanctions, which presented an *ex post facto* problem in violation of the United States Constitution. In addition, the new compensatory damages provision was the kind of legal change that would have an effect on the planning of conduct on behalf of a party. Moreover, the additional damages based on a different standard of behavior was seen as creating a new cause of action not available in prior law, and the substantial increase in liability was an important legal consequence of an action of which a party should be aware before it is applied.

In other words, in a civil case, people take into account the amount of damages they might have to pay when determining whether they will violate the law. Therefore, in order to prevent unfairness, the amount of damages and the corresponding behavior which might trigger those damages, is something of which a party should be made aware. For example, if a civil rights violation carries only a $100 fine, the party may decide the violation is worth the penalty. However, if the fine is $100,000, this may cause the party to reconsider its willingness to violate the law. *Landgraf* tells us that a statutory change such as this, that is, a change that attaches additional legal consequences to pre-litigation conduct, is one which the party should know at the time of his conduct. However, other statutes, such as procedural rules that would not affect pre-litigation conduct, do not carry the same risk of unfairness because the party does not weigh these heavily when considering the probable consequences of his conduct that would give rise to a lawsuit.

## B. Application of Landgraf Test To Lanham Act Amendment Cases

There is a split of authority regarding the application of other Lanham Act amendments to pending cases. Several courts have applied the *Landgraf* test in determining that amendments to the Lanham Act did not have a retroactive effect and did apply to pending cases. For example, the Eighth Circuit held that the provision of the Federal Trademark Dilution Act allowing injunctive relief must be applied to pending cases, even though the events that gave rise to the original case happened before the effective date of the act. *Viacom Inc. v. Ingram Enterprises, Inc.*, 141 F.3d 886 (8th Cir. 1998). The Second Circuit agreed, and held that injunctive relief provisions of both the Federal Trademark Dilution Act and the Anticybersquatting Consumer Protection Act must be applied to pending cases. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2nd Cir. 2000). This conclusion was also reached in at least three other district court decisions. *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.3d 117 (D.Mass. 1999); *Medic Alert Found. U.S., Inc., v. Corel Corp.*, 43 F.Supp.2d 933 (N.D.Ill. 1999); *Fuente Cigar, Ltd. v. Opus One*, 985 F.Supp. 1448 (M.D.Fla. 1997). In holding that a party's expectation interest is not a justifiable reason to refrain from imposing existing law on pending cases, the *Fuente* court reasoned,

> Expectations, however justified and however dearly purchased, cannot immunize future conduct from legislative fiat. As the Supreme Court stated, 'a statute does not operate retroactively merely because it upsets expectations based on prior law. Indeed, statutes routinely impose novel costs on prior business decisions. . . . Rights in the context of Landgraf should not be construed so broadly so as to sweep within its ambit mere expectation interests. . . .

Most, if not all, laws reach into the past. . . . [A]ll laws are at least 'weakly retroactive,' changing the legal consequences of prior events from the date of the creation of the law. Not all are 'strongly retroactive,' however; that is, not all change the legal consequences of prior events from the date at which the event occurred, thus operating as if the new rule had always been the law. It is only this latter group that implicates the Landgraf/retroactivity analysis.

*Fuente*, 985 F.Supp. at 1453 & n.2 (citations omitted).

Conversely, the court in *Circuit City Stores, Inc. v. OfficeMax, Inc.*, 949 F.Supp. 409 (E.D.Va.1996) held that the Federal Trademark Dilution Act could not be applied and enforced retroactively because it created a new cause of action which did not exist under the prior law. The court reasoned that the statute had a retroactive effect because it upset the "settled commercial expectations" of the defendant. *Id.* at 418. "[E]xpectations, in retroactivity jurisprudence, are those grounded in the law controlling conduct at the time it occurred. In that regard, when [the defendant] commenced operations, less than half of the states had recognized a cause of action for dilution. And, significantly, there was no such federal cause of action." *Id.* A similar conclusion was also reached in *Nike, Inc. v. Nike Securities, L.P.*, No. 97C008, 1999 WL 98346 (N.D.Ill. Feb. 19, 1999); *S Indus., Inc. v. Diamond Multimedia Systems, Inc.*, 991 F.Supp. 1012 (N.D.Ill. 1998); and *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Dev. Corp.*, 973 F.Supp. 552 (M.D.N.C. 1997).

T & B points to the *Circuit City* line of cases in support of the argument that the amendment at issue should likewise not be applied to this case. However, T & B fails to recognize that, in each case, the court refused to apply the law because the particular provision at issue gave rise to a new cause of action which triggered damages that were not

in the prior statute. The *Viacom* line of cases applied the same Lanham Act amendments to pending cases, allowing injunctive relief but not damages, even though the events that gave rise to the original case occurred before the amendments became law, based on the reasoning that injunctive relief is prospective relief which must be applied to pending cases. Although the courts following *Viacom* thought it unfair to assess damages on pre-litigation conduct that was previously legal, the courts held that, as of the effective date of the amendment, the conduct of the defendants became illegal, and were subject to an injunction to stop that conduct from continuing.

To the extent that the Lanham Act amendments in the aforementioned cases contain damage provision for new causes of action, the facts of these cases are distinguishable from the present case. Section 5 of the TAA at issue in this case does not provide for any new cause of action or penalties, it simply governs courtroom conduct of the parties after litigation has been filed.

## III. APPLICATION OF THE LANDGRAF TEST TO THIS CASE

The starting point for an analysis of the retroactivity of an intervening statute is *Landgraf*. The Court will apply the retroactivity test as set forth in *Landgraf* to the facts of this case, and will then consider both lines of cases as represented by *Bradley* and *Bowen*.

### A. Congressional Language In The Statute And Legislative History

The first step in the analysis is whether Congress has explicitly mandated a temporal reach of the statute's application. If so, the analysis is over and the Court must follow the intent of Congress as expressed in the statute and legislative history. Unfortunately, the

language of the statue and its corresponding legislative history provides little guidance as to the application to pending cases. The relevant portion of PL 106-43 entitled the "Trademark Amendments Act of 1999" states the following: "Section 43(a) of the Trademark Act of 1946 (15 U.S.C.1125(a)) is amended by adding at the end the following: (3) In a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."

House Report No. 106-250 states that the purpose of the law is to "make significant improvements in trademark law." H.R.REP. No. 106-250, (1999). Specifically,

> Section five amends section 43(a) of the Lanham Act to provide that in an action for trade dress infringement, where the matter sought to be protected is not registered with the U.S. Patent and Trademark Office, the plaintiff has the burden of proving that the trade dress is not functional. A functional feature of trade dress is one that is commonly used by similar businesses, protection of which would hinder competition. If a mark is registered, there is a presumption that it is not functional. However, for plaintiffs of unregistered marks to be given the same presumption would not promote fair competition of registration. . . . This amendment seeks to ensure that marks that are functional are not registered. Functional marks should be dealt with under patent law. Therefore, it should be incumbent on the plaintiff suing for infringement of an unregistered mark to prove that the mark is not functional.

*Id.*

The date of the Amendment is August 5, 1999. Congress made no indication whether it must be applied to cases pending as of that date. Because Congress has not made clear whether the application is operative to pending cases, the Court must determine if applying

the Amendment to pending cases would have a genuinely retroactive effect. If so, the Amendment must not be applied; if not, the Amendment will be given effect.

## B. The Amendment Has No Retroactive Effect

To determine whether a statute has retroactive effect, the Court must consider whether the application of the statute would impair rights a party possessed when he acted, or whether it increases a party's liability for past conduct, or whether it imposes new duties with respect to transactions already completed. In short, the court must determine whether the Amendment attaches "new legal consequences" to prior events, such that, if the party had known of the statute, it would have had an effect on the party's choice of behavior. If any one of these conditions is present, the statute has a retroactive effect, and must not be applied to the pending case.

### 1. The TAA Does Not Impair Rights Thomas & Betts Possessed When It Acted

The Amendment does not impair any trade dress rights that T&B possessed prior to bringing this lawsuit. First, a party does not possess a right to a procedural process that is not constitutionally protected. *Ex parte Collett*, 337 U.S. 55, 71, 69 S.Ct. 944, 953 (1949)("No one has a vested right in any given mode of procedure."). It would be one thing for a statute to take away a criminal defendant's constitutional right to a jury trial. It is quite another to simply clarify who has the burden of proof when the prior statue is silent as to that issue. It has been a foundation of law in our country and common law in England that a plaintiff bears the burden of proving his case; other than when it is provided in a statute, it is usually not incumbent upon the defendant to prove his lack of liability. The prior version

17

of the Lanham Act was silent as to who carried the burden of demonstrating functionality in an unregistered trademark or trade dress infringement case. Because of this silence, the issue as to who carried the burden was developed in common law, with each court determining who bore the burden on a case by case basis. This resulted in a split in the circuits. The Amendment merely clarifies that the plaintiff, as is the normal procedure, bears the burden.

Furthermore, T & B also cannot claim that it had "settled commercial expectations" that Panduit would bear the burden of non-functionality. Although fairness is certainly a consideration in a retroactivity analysis, a party's expectations are not immunized against legislative change. If expectations can be claimed at all, a party can only claim that it has settled commercial expectations where it is a well-established area of law controlling conduct at the time the conduct occurred. In this case, the issue of who bore the burden of proof regarding non-functionality of trade dress was anything but settled prior to T & B's filing of this action and after. Because the prior statute was silent on the subject, a split existed in the circuits, with the Third, Eighth and Ninth Circuits holding that the plaintiff bore the burden of proving non-functionality of a non registered mark. *Versa Products Co. v. Bifold Co.*, 50 F.3d 189, 199 (3rd Cir. 1995); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994); *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980). However, the Seventh and Second Circuits placed the burden on the defendant to prove functionality of the mark to prevail. *Thomas & Betts*, 138 F.3d at 297; *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1006 (2nd Cir. 1995). Others simply passed on the subject. *Tools USA & Equipment Co. v. Champ Frame Straightening, Inc.*, 87 F.3d

654, 657 n.2 (4th Cir. 1996); *Tec Engineering Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 546 n.3 (1st Cir. 1996). Therefore, Plaintiffs could not have possessed a "right" or even a strong expectation that defendant bore the burden on the issue of functionality.

In addition, the holder of a registered trademark can be said to hold a property right, consisting of a bundle of rights which are bestowed by the Patent and Trademark Office ("PTO") upon meeting a number of conditions. The Supreme Court cautioned that in matters affecting contractual and property rights, predictability and stability are of prime importance, and the presumption against retroactivity should be applied. However, the holder of a mark that is *not* registered does not carry the same bundle of rights, or presumptions at trial, as one who has registered his mark.

Also, when a trademark is registered, one of the key features that the registrant must prove is non-functionality. Although not expressly mentioned in the Lanham Act, as a matter of public policy, trademark protection is denied to features that serve a function other than denoting the source of goods. *Playboy Enterprises, Inc. v. Chen*, 45 U.S.P.Q.2d 1400, 1405 (C.D.Ca. 1997) (citing 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §7.63 (1997)). For this reason, when a trademark infringement case comes before the court, there is a presumption that the registered trademark is not functional. As the majority of the circuits have recognized, the plaintiff bears the burden of proving his case, including the non-functionality of the plaintiff's mark. By registering the mark, the plaintiff meets this burden with the presumption in the plaintiff's favor. *Playboy*, 45 U.S.P.Q.2d at 1407. Therefore, the majority of circuits have held that when a plaintiff does

19

not benefit from this presumption, as is the case when a mark is not registered, the plaintiff must prove non-functionality as part of its *prima facie* case. *Id*. As Congress realized, illustrated by the legislative history of the Amendment, it is unfair to give that same presumption to a person who did not register the mark. Thus, it is fair and reasonable to require the holder of a mark that is not registered to prove its non-functionality to the court, just as the holder would have had to do before the PTO.

Finally, the issue of who bears the burden of proving the functionality of a trademark at trial does not change the acceptable standard of behavior. Nor is it not the kind of law that would affect a party's decision making process regarding his conduct prior to the filing of the lawsuit. The burden of proof only affects a party's conduct *after* the filing of the lawsuit. It seems fallacious to argue that a party would take into consideration the burden of proof at trial in deciding whether or not to register a mark with the PTO.

A statutory clause regarding a burden of proof does not govern conduct that would give rise to a lawsuit. It merely governs conduct after a lawsuit is already filed. To this end, the Supreme Court in *Landgraf* stated that the statutory amendment at issue in that case which gave one party a right to a jury trial, was "plainly a procedural change of the sort that would ordinarily govern in trials conducted after its effective date . . . regardless of when the underlying conduct occurred."[1] The provision in this case is similar, in that it only affects

---

[1] Ultimately, because the jury trial was only available if the party sought compensatory or punitive damages, which were found to be retroactive, the new jury trial provision was not applied to the pending trial. *Landgraf*, 511 U.S. at 281, 114 S.Ct. at 1505.

a party's conduct at trial, and thus has no retroactive effect.

In summary, the Court finds that the Amendment does not impair any rights that T&B possessed prior to filing the lawsuit or when the conduct at issue occurred.

## 2. The Amendment Does Not Increase A Party's Liability For Past Conduct

The Amendment increases neither T & B's nor Panduit's liability for their conduct prior to this lawsuit. The Amendment does not call for any increase in damage awards or fines, nor does it add any new cause of action to previously legal conduct. Merely requiring a party to bear the burden of proof of non-functionality of an unregistered trade dress at trial, when they would have had to prove non-functionality to the PTO had they registered the trade dress, is not additional liability for conduct prior to the lawsuit.

The Seventh Circuit commented regarding the burden of proof on functionality and the circuit split: "Very little turns on resolving the circuit conflict, both because evidence of functionality is equally available to both parties and because functionality and distinctiveness are intertwined issues." *Publications International Ltd. v. Landoll, Inc.*, 164 F.3d 337, 341 (7th Cir. 1998). Contrary to T & B's assertion that this issue is outcome determinative, the Seventh Circuit seemed little concerned by the issue of which party bore the burden of proof. While it may be true that functionality of a trade dress is outcome determinative in an infringement case, as functionality or the lack thereof determines protectability, it is *not* true that placement of the burden of proof regarding functionality is outcome determinative. If that were the case, a plaintiff, upon whom the burden is usually placed, would never win a lawsuit.

21

The additional liability that was of concern to the *Landgraf* court was additional legal consequences for conduct that gave rise to the lawsuit. *Landgraf*, 511 U.S. at 270, 114 S.Ct. at 1499. In this case, the conduct that gave rise to the lawsuit was Panduit's alleged infringement, not T & B's conduct. T & B's failure to register did not give rise to this lawsuit. Therefore, the Court finds that the Amendment did not increase T & B's liability for past conduct.

### 3. The Amendment Does Not Impose New Duties For Transactions Already Completed

Similarly, the Amendment does not impose new duties on either T & B or Panduit for pre-litigation conduct or for transactions already completed. Again, the primary concern of the *Landgraf* court was for additional duties or obligations on the party whose conduct gave rise to the lawsuit at issue. Notably, this factor addresses "transactions, " and goes to the need for predictability and stability in matters affecting contractual rights between private parties. *Landgraf*, 511 U.S. at 270, 114 S.Ct. at 1500. There is no contract at issue here, and the parties have not entered into any transaction. Infringement of intellectual property rights has generally been held to be a tort. *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*, 8 F.3d 441, 445 & 447 (7th Cir. 1993).

Contrary to T & B's argument, the Amendment does not impose additional duties on transactions already completed. It simply requires T & B to do an act in the future, that is, it must carry the burden of proving non-functionality at trial. T & B has had notice since August of 1999 when the law was enacted. The trial date is set for October 16, 2000. Therefore, at the time this obligation must be performed, T & B will have had fourteen

months notice. It is not "manifestly unjust" to give a party 14 months notice before they are required to perform. Indeed, many substantive laws go into effect that require immediate compliance.

In summary, because the Amendment does not impair rights T & B possessed when it acted, increase T & B's liability for past conduct, or impose additional duties on T & B for prior transactions, the Court holds that the Amendment does not have a retroactive effect. Accordingly, T & B has the burden of proof on the issue of functionality.

## IV. THE AMENDMENT MEETS THE BRADLEY "MANIFEST INJUSTICE" TEST

In addition, the Court considers this case in light of *Bradley*, in which the Supreme Court held that a court is to apply a law in effect at the time it renders its decision unless doing so would cause manifest injustice. *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. The Court considered a) the nature and identity of the parties, b) the nature of the parties' rights, and c) the nature of the impact of the change in law upon those rights. As previously discussed, *Bradley* was upheld, not overturned, by *Landgraf*, which reconciled and distinguished the two lines of cases.

### A. The Nature of the Parties

The *Bradley* Court's discussion on this issue centered around the fact that the defendant was a public entity entrusted to educate our nation's children in compliance with the Constitution, and the plaintiff was a private citizen simply attempting to educate her child in a nondiscriminatory school system. *Id.*, 416 U.S. at 718, 94 S.Ct. at 2019. Also important

was the Court's conclusion that the matter was of great national concern, as opposed to simply a private contract dispute. *Id.*, 416 U.S. at 719, 94 S.Ct. at 2020.

In this case, while the dispute is between two private parties, Congress in the legislative history, emphasized the importance of strong intellectual property laws to encourage American creativity, support the American economy, and protect the investment of American businesses from infringement. Senator Hatch, recognizing that "high technology is the driving force in the American economy today," stated, "Intellectual property is the lifeblood of [information technology] companies . . . and even a single instance of piracy may be enough to drive them out of business." 145 CONG.REC. S7452-04 (June 22, 1999)(statement of Sen. Hatch).

Thus, just as Justice Marshall recognized in 1801 that the seizure of a French vessel by an American ship was a matter of "great national concern," justifying application of the existing law to the case pending before it, and was not simply a "mere private case between individuals" in which application of a law would affect the contractual rights of the parties, so too does this Court recognize that intellectual property matters are a matter of great national concern. *Schooner Peggy*, 5 U.S.(1 Cranch) at 110. The Court does not perceive this as the type of case that would present the threat of manifest injustice to private parties that have agreed upon rights with respect to each other, such as would be found in a private contract or transaction.

## B. Nature Of The Parties' Rights

In this second factor, the Supreme Court was concerned that the application of an intervening change in statute may "infringe upon or deprive a person of a right that had matured or become unconditional." *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020. This Court finds no matured or unconditional right in this case that may be infringed.

As previously mentioned, T & B may have had an expectation that Panduit would bear the burden of proving functionality as an affirmative defense based on previous rulings by the Seventh Circuit, but it certainly cannot be said that this is a matured or unconditional right. The majority of circuits have taken an opposing position, and it could be equally expected that, at some point, Congress or the Supreme Court would act to clear up the split in the circuits, which is precisely what happened.

By way of analogy, the Court considers the ruling in *DIRECTV, Inc. v. Federal Communications Comm'n*, 110 F.3d 816 (D.C.Cir. 1997) in which the D.C. Circuit held that, despite a previous order from the FCC which proclaimed that any reclaimed channels would be allocated on a pro rata basis to those entities with preexisting FCC permits, and despite the fact that those entities spent millions of dollars on satellites with transponders for more channels than originally assigned in reliance on the FCC's order, the FCC's auction of the reclaimed channels were not retroactive. In so holding, the court reasoned that the FCC's previous ruling did not give those entities with preexisting permits any "rights." "Although the petitioners may reasonably have expected that . . . they would receive a pro rata portion of any channels the Commission reclaimed, a new rule or law is not retroactive 'merely

because it . . . upsets expectations based on prior law.'" *Id.* at 826 (quoting *Landgraf*, 511 U.S. at 269, 114 S.Ct. at 1499.)

## C. Nature Of The Impact Of The Law Upon Parties' Rights

The third concern stemmed from the possibility that new and unanticipated obligations may be imposed on a party without notice or the opportunity to be heard. *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2021. The Court finds that application of the TAA to this case gives both parties ample notice, as the Amendment was passed in August of 1999 and the trial is not until October of 2000.

In finding an award of attorney's fees under the intervening statute appropriate, the Court in *Bradley* based its holdings on three principles. First, the Court reasoned that the new provision did not change the substantive obligations of the parties that gave rise to the lawsuit, that is, the defendant still had a constitutional responsibility to provide pupils with nondiscriminatory education. *Bradley*, 416 U.S. at 721, 94 S.Ct. at 2021. Second, the Supreme Court found additional support for the award of attorney's fees because there were additional theories under which the district court could have awarded attorney's fees, even without the new provision. *Id.* Third, the Court reasoned that the provision was not the kind of statute that would enter into a party's decision-making process and cause a party to change its behavior that gives rise to the lawsuit. Notably, the Court said, "there is no indication that the obligation under [the new provision], if known, . . . would have caused the Board to order its conduct so as to render this litigation unnecessary and thereby preclude the incurring of such costs." *Id.*

Similarly, in this case, the burden of proof provision did not change the substantive obligations of the parties; Panduit still has an obligation not to infringe upon T & B's trade dress, and if T & B had registered, it would still have been under an obligation to demonstrate non-functionality to the PTO as a condition of registration. Second, under case law in the majority of circuits, there is support for placing the burden of proving non-functionality on the plaintiff.

Finally, there is no indication that, had T & B known of the provision, they would have conducted their affairs any differently. Trade dress is an important intellectual property that can be protected on a national level in all judicial circuits by registration with the PTO. It is reasonable to think that a corporation which places a high value on its trade dress would have taken reasonable steps to protect it and would have registered its trade dress if it had felt a need to do so, as opposed to relying on the uncertainty of case law that varies circuit by circuit to protect its property. Had the defendant been someone other than Panduit that had allegedly infringed on T & B's trade dress, T & B may well have been forced to bring this suit in another circuit that placed the burden of proving non-functionality on the plaintiff.

In addition, if T & B had taken steps to register its trade dress, as it claims it "might" have, had it known that this new law would be applied to this case, in so doing, it would have had to prove to the PTO the non-functionality of its trade dress, the very act of which it now complains. In fact, T & B *did* try to register its trademark on two occasions. An application filed April 24, 1995 was submitted for trademark 74667628, and an application filed May 11, 1995 was submitted for trademark 74674746. T & B requested that the PTO Examiner

suspend proceedings on both applications until final disposition of the lawsuits relating to the trademark. In Plaintiff's February 22, 1996 letter to the Assistant Commissioner for Trademarks in response to an Office Action, T & B states that "the issues of functionality and distinctiveness which form the basis of the Examiner's present refusal to register, are intimately involved in the pending litigation." Thus, it appears that functionality was one of the reasons the application was rejected, which is precisely the issue on which T & B wants a presumption. In sum, T & B could not prove non-functionality to the PTO, did not want to ruin it's chances at trial with a rejection by the PTO so it asked the PTO to put a hold on proceedings, but would like this Court to presume non-functionality anyway. Thus, T & B's complaint that it "might" have tried to register its trade dress is disingenuous. The Court can find no additional obligation upon T & B with the application of this Amendment to the pending case. T & B simply wants to have it both ways, which is not possible.

## V. APPLICATION OF THE TAA IS CONSISTENT WITH BOWEN

Application of the Amendment to this case is consistent with the principles set forth in *Bowen*, in which the Supreme Court stated "Retroactivity is not favored in the law." *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471. The facts in that case are distinguishable, and this Court's holding does not contradict the Supreme Court's ruling. In *Bowen*, the Secretary of Health and Human Services promulgated a regulation in 1984 setting limits on the level of reimbursable Medicare costs to a period starting in 1981. *Id.*, 488 U.S. at 206-8, 109 S.Ct. at 470-1. The Secretary then sought to recoup sums previously paid to various hospitals for that period. "In effect, the Secretary had promulgated a rule retroactively." *Id.*, 488 U.S. at

207, 109 S.Ct. at 471. The Secretary claimed it had authority to promulgate retroactive regulation based on 1) a specific grant of authority pursuant to 42 U.S.C. §1395x(v)(1)(A)(ii) that "provide[s] for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive" and 2) a general grant of authority pursuant to §§ 1395(v)(1)(A), 1395hh, and 1395ii to promulgate cost limit rules. The Supreme Court refused to allow the retroactive law to stand, finding that the Secretary did not have the authority to promulgate such retroactive regulations. Specifically, the Court held that the provision allowing for retroactive adjustments was exactly that, a provision to be applied on a case-by-case basis to correct inadequacies in individual cases, not a license for wholesale retroactive rule making. *Id.*, 488 U.S. at 209, 109 S.Ct. at 472. Second, the Court held that legislative history connected with the general grant of authority to set cost limits specifically stated that "[t]he proposed new authority to set limits on costs . . . would be exercised on a prospective, rather than retrospective, basis so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid having costs that are not reimbursable." *Id.*, 488 U.S. at 214, 109 S.Ct. at 474 (quoting H.R.Rep. No. 92-231, p. 83 (1971)).

*Bowen* is distinguishable for several reasons. First, unlike the regulation in *Bowen* which was retroactive on its face, the TAA is not retroactive on its face. It is to be applied prospectively from the date of the passage of the Amendment. It regulates courtroom conduct for trials conducted after the effective date of the TAA. Second, the Court need not

look into the legislative history for specific or even general authority for Congress to act retroactively, because the Amendment is simply not retroactive on its face, nor retroactive in effect. It merely applies to lawsuits that are pending at the time of its enactment and those subsequently filed.

## VI. THIS COURT'S RULING IS SUPPORTED BY OTHER CASE LAW

This Court's ruling is supported by the recent Supreme Court decision in *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. _____(No. 99-150)(2000 WL 293328)(Mar. 22, 2000) in which the Supreme Court held that in an action for infringement of unregistered trade dress under §43 of the Lanham Act, a product's design is distinctive, and thus protectable, only upon a showing of secondary meaning. In support of its holding, the Court found the issues of distinctiveness and functionality intertwined, and that the principles used in determining a mark's distinctiveness under §2 of the Lanham Act, which sets forth the explicit requirement of distinctiveness for registration of trade mark, are also applicable under §43(a) when determining whether an unregistered trademark is entitled to protection. The Court referred to the Amendment three times during its opinion as support for its decision, even though the lawsuit was filed years before the Amendment was enacted. T & B argues that the Supreme Court did not mention retroactivity of the Amendment and that the Court's holding did not address the issue of the retroactive application. There is no reason why the Court should mention the retroactive application of the Amendment. By their silence on the topic of retroactivity, their discussion of the burden of proof provision, and

the use of the provision in their reasoning applied to a pending case, it is clear that the Court

simply followed the normal custom to apply the law existing at the time of its decision.

In addition, this Court finds the reasoning of *Primes v. Parish National Bank*, Civ.A.

No. 93-3737,1995 WL 241853 (E.D. La. Apr. 24, 1995) persuasive. In that case, the court

held that an amendment incorporating the legal burdens of proof to a statue that was initially

silent regarding the burden of proof was to be applied to the pending case. In holding that

the amendment did not carry any danger associated with retroactive application, the court

stated the following:

> The burden of proof . . . does not impair defendant's pre-existing rights, increase its liability or impose a new duty. Furthermore, the rationale underlying the retroactive effect doctrine - that the imposition of new burdens on persons after the fact would be unfair - is absent.

> The presumption that a statute should not be applied retroactively where substantive rights are involved is based on 'the unfairness of imposing new burdens after the fact.' The burden of proof at issue herein does not 'impose an additional or unforeseeable obligation.' It 'does not make unlawful conduct that was lawful when it occurred.' To the contrary, the burden of proof is implicated only after a code of conduct has been broken. Thus, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place ' is muted because no settled expectations have been disrupted. The burden of proof does not affect parties' pre-litigation conduct; it does not change the acceptable standard of behavior. The burden of proof, rather, imposes rules on the litigants only after a party has allegedly failed to conform to the proper standard of conduct. The applicable burden of proof is not a 'matter in which predictability and stability are of prime importance.'

Id. at *4(citations omitted).

Other courts have addressed the retroactivity of a statutory amendment relating to a

burden of proof after *Landgraf*. For example, in *Graffam v. Scott Paper Co.*, 870 F.Supp

389 (D.Me. 1994) *aff'd* 60 F.3d 809 (1st Cir. 1995), the district court held that the Civil

Rights Act of 1991 relating to the burden of proof requirements for disparate impact analysis

applies to pending cases. The court noted that rules controlling the burden of proof are not

clearly substantive or procedural, although at least one court has held the burden of proof to

be procedural. *Id.* at 393 & n.8. Conversely, the Eighth Circuit held that the same §105 of

the Civil Rights Act of 1991 relating to the burden of proof was not applicable to the case

pending before it because it "reallocates and raises the burden of persuasion with respect to

a business justification defense and redefines precisely what constitutes a valid business

justification" and would "attach new legal consequences to employment decisions made prior

to its enactment." *Davey v. City of Omaha*, 107 F.3d 587, (8th Cir. 1997). With due respect

to the Eighth Circuit, this Court is of the opinion that the holding in *Graffam* is better

reasoned. In any event, if, in fact, §105 does redefine an element of the case along with

shifting the burden of proof, it would be distinguishable from the present case, in that the

TAA does not redefine anything; it merely places the burden squarely on the shoulders of

the plaintiff.

## VII. THE TEMPORAL REACH OF SECTION 5 OF THE TAA IS SILENT, THEREFORE NORMAL JUDICIAL PRINCIPLES APPLY

The Court observes that Section 2 of the TAA, which relates to dilution as a grounds

for opposition and cancellation of trademarks, is separate and apart from Section 5, which

deals with the issue at hand. Section 2 was enacted because dilution of a famous mark was

previously something that the PTO could not consider as grounds for denying registration

when applicants applied for a registered mark. 145 CONG. REC. S8252-01 (July 12, 1999)(statement of Rep. Leahy). Prior to its enactment, the only way a trademark owner could protect his famous mark from dilution was to file a lawsuit after the alleged dilution, because dilution was not a consideration to the PTO when a potentially dilutive mark requested registration. *Id.* Thus, it is logical that Section 2 included a temporal reach instructing the PTO when it must start applying this consideration of dilution in its proceedings. Specifically, the amendment states: "The amendments made by this section shall take effect on the date of enactment of this Act and shall apply only to any application for registration filed on or after January 16, 1996." PL 106-43. Clearly, this temporal reach applies only to Section 2.

On the other hand, Section 5 deals with who bears the burden of proof at trial. Congress made no time specific application, although they certainly could have. The only logical reasons for this lack of guidance is either laziness, literary ineptness, or an intent to apply the judicial default rules under *Landgraf*. This Court refuses to adopt the first two alternatives, and thus, can only surmise that the latter one is the intended result. *Landgraf* teaches us that there is no special reason to think that all the diverse provisions of an act must be treated uniformly for retroactivity analysis purposes, and that the general provision that an act must "take effect upon enactment" means that "courts should evaluate each provision of the [a]ct in light of ordinary judicial principles concerning the application of the new rules to pending cases and preenactment conduct." *Landgraf*, 511 U.S. at 280, 114 S.Ct. at 1505. While Section 5 is silent as to when the Amendment is to take effect, the only logical option is to apply the judicial principles as outlined in *Landgraf* and as applied herein.

## VIII. CONCLUSION

For the foregoing reasons, **the Court holds that Section 43(a)(3) of the Lanham Act 15 U.S.C. §1125(a)(3), enacted as PL 106-43 Section 5 of the Trademark Amendments Act of 1999 relating to the burden of proof of the functionality of non-registered trade marks and trade dress applies to pending cases.** Therefore, Plaintiffs Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. bear the burden of proving non-functionality of their unregistered trade dress as part of the claim of trade dress infringement against Defendant Panduit Corp.

**SO ORDERED THIS 18TH DAY OF JULY, 2000**

_Morton Denlow_
**MORTON DENLOW**
**United States Magistrate Judge**

Copies Mailed To:
Marc Fogelberg
McBride Baker & Coles
500 W. Madison Street, 40th Floor
Chicago, Il 60661-2511
Attorneys for Plaintiff

Sidney David
Stephen F. Roth
Renee M. Robeson
J. Kirkland Douglass
LERNER, DAVID, LITTENBERG,
   KRUMHOLZ & MENTLIK, LLP
600 South Avenue West, Suite 300
Westfield, New Jersey 07090-1497
Of Counsel for Plaintiff

Roy E. Hofer
Gary Ropski
John T. Gabrielides
Scott J. Slavick
Nicholas G. de la Torre
BRINKS HOFER GILSON & LIONE
455 North Cityfront Plaza Drive
NBC Tower 36th Floor
Chicago, Illinois 60611
Attorneys for Defendant

Robert A. McCann
PANDUIT CORP
17301 Ridgeland Avenue
Tinley Park, Illinois 60477
Of Counsel for Defendant